**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**ALLEN L. BEACH,**

Plaintiff,

v.

**YELLOW FREIGHT SYSTEM, INC.,**

Defendant.

Civil No. 00-754 (JGL)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT**

---

APPEARANCES

Jeffrey R. Anderson, Esq., and Barbara J. Felt, Esq., on behalf of Plaintiff.

Steven L. Brenneman, Esq., Andrew R. Clark, Esq., Teri F. Thompson, Esq., and Amanda C. DuPont, Esq., on behalf of Defendant.

---

JONATHAN LEBEDOFF, United States Magistrate Judge

The above-entitled matter came on for trial from October 1, 2001 through October 4, 2001 before the undersigned Magistrate Judge of District Court. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties voluntarily waived their rights to proceed before a judge of the United States District Court and consented to have the undersigned United States Magistrate Judge conduct all proceedings in the case, including entry of

FILED 10-31-01
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD 10-31-01
DEPUTY CLERK

a final judgment. Upon agreement by the parties and in accordance with Federal Rule of Civil Procedure 52, the trial was conducted without a jury.

In this case, Plaintiff Allen L. Beach ("Beach") charges his employer, Defendant Yellow Freight System, Inc. ("Yellow") with same-gender sexual harassment under the Minnesota Human Rights Act. Beach claims Yellow failed to take appropriate action to remedy sexual graffiti directed at him in the workplace. Based upon all the files, records, and proceedings herein, upon the testimony, exhibits, and other evidence produced at trial, and upon the argument and memoranda of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

**Background**

1. Defendant Yellow is a trucking company engaged in the business of freight transportation. Yellow is incorporated in Delaware, and its principal place of business is in Overland Park, Kansas. Yellow has a distribution center in Burnsville, Minnesota ("the Burnsville terminal").

2. The Burnsville terminal is located on fifty-six acres of land, although twenty-seven acres are undeveloped. The loading dock is 500 yards in length and between thirty and forty yards in width. The terminal operates

twenty-four hours a day, seven days a week. The City Operation of Yellow's Burnsville terminal is comprised of approximately 170 trucks.

3. Plaintiff Beach is a male and is currently employed by Yellow at the Burnsville terminal. Beach has been employed by Yellow since 1986.

4. Beach has worked in a variety of positions at Yellow including dock worker, hostler, and city driver. A hostler is also known as a yard worker. For the past ten years, Beach has worked a flex shift from Saturday through Tuesday: as a hostler on Saturday and Sunday and as a city driver on Mondays and Tuesdays. As a city driver, Beach is responsible for delivering and collecting freight. Beach drove the Golden Valley route until September 1999, at which time he began driving the Red Wing route.

5. From at least 1995 to present, all of Beach's supervisors and managers at Yellow have been male.

6. At all relevant times, Beach has been a member of Teamsters Local 120, affiliated with the International Brotherhood of Teamsters. Of the 500 workers at the Burnsville terminal, approximately 400 are also represented by the Teamsters union.

**Graffiti Targeting Beach and Yellow's Direct Response: 1995 to Approximately March 1999**

7. In June 1995, Beach saw the phrase "Al Beach sucks" written on the interior wall of a Yellow trailer. Thereafter in 1995, Beach also saw the

phrases "Al Beach sucks cock" and "Al Beach is gay." The graffiti made Beach feel uneasy and sad, but he thought it was a joke and tried to ignore it. Beach did not know who wrote the phrases and did not immediately tell anyone about the graffiti because he felt humiliated.

8. The Court finds credible Beach's testimony that in September 1995, he first reported the graffiti to his supervisor, Thomas L. Cover, who was employed as Yellow's City Operations Manager at the Burnsville terminal. Cover held that position from 1991 to 1998. Beach told Cover that he could tolerate "jokes" and "playing around," but that he was getting "tired" of the graffiti, and it should be stopped. According to Beach, Cover agreed it should stop and told Beach he would investigate the matter.

9. Cover recalled receiving a report from Beach about graffiti on the trailer to which he was assigned, but recalls only that the incident occurred before 1998. According to Cover, Beach was upset and insulted. Cover inspected the graffiti, had it removed, and switched the freight to another trailer. Cover also talked to Paul Trautwein, the General Operations Manager at the time, about the incident. Cover does not recall what the graffiti said. There is no evidence that Trautwein took any action.

10. During 1995 and 1996, Beach continued to see similar graffiti directed at him in more Yellow trailers, which made him feel demeaned and degraded.

11. On an unspecified date after September 1995, Beach and another employee recorded the identifying numbers of some of the trailers containing graffiti. Beach gave the written report to Cover. Although Cover does not recall this incident and denied that Beach reported any graffiti to him prior to 1997, the Court finds Beach's testimony credible.

12. In 1996, Beach took twenty to thirty photographs of graffiti inside trailers at the Burnsville terminal. The graffiti said "Al Beach sucks," "Al Beach is gay," and "Fuck you, Al Beach." Beach gave the photographs to Trautwein and complained that he should not have to tolerate the graffiti. Trautwein told Beach he would report the matter to his supervisor, Distribution Center Manager Jeff Harvey. Although Beach told Trautwein he suspected an employee named Brian Drenkhans was responsible, Trautwein did not tell that to Harvey. Trautwein gave the photographs to Harvey and took no further action. There is no evidence that Harvey took any action at all. Trautwein does not have the photographs or know where they are located at this time.

13. Beach never again complained to Trautwein about graffiti. If Trautwein saw graffiti at the Burnsville terminal, he removed it or had it removed. Trautwein has never reported a complaint of sexual harassment to Human Resources and had never participated in a sexual harassment investigation until 2000.

14. On an unspecified date, Beach met with Harvey and asked him to investigate the source of the graffiti. Beach suggested that Harvey compare the graffiti with handwriting on employment applications. Harvey agreed to do so, but did not. Beach even offered to give Harvey 1500 wooden pallets from Beach's own small business if Harvey would investigate.

15. The graffiti worsened and began to appear on forklifts and in stairwells, bathrooms, and more trailers. From 1996 to 1999, Beach saw additional graffiti such as "Al Beach fucks his mother in the ass" and "Give Beach a buck and he'll fuck you in the butt." Customers and co-workers also saw the graffiti and mentioned it to Beach.

16. At the height of the graffiti, Beach claimed he saw graffiti in seventy percent of City Operations trailers, which he estimated as fifty to sixty trailers. The Court finds credible Beach's testimony regarding the prevalence and escalation of graffiti in trailers, but does not accept Beach's estimation of the number of trailers.

17. Beach credibly testified that as a result of the graffiti, he felt cheapened and that it was difficult to go to work and do a good job. Beach also felt "lousy," withdrawn, and sad. He began using the manager's bathroom to avoid seeing the graffiti written about him in the employee bathroom.

18. At some point, Beach approached Steven Rhodus, a Shift Operations Manager at Yellow at the time, and complained about the graffiti.

Beach told Rhodus to "get this shit out" of the trailer Beach was assigned to drive because he was "sick of this shit." Rhodus told Beach not to "get on to" him because Rhodus had just started his job.

19. In late 1998 or early 1999, Beach told Rhodus he wanted to talk to someone at Yellow's headquarters in Kansas. Rhodus remembered giving Beach the phone number of someone at Yellow's headquarters, but denied that Beach told him it concerned graffiti. The Court finds Rhodus not entirely credible given that in his deposition, he testified he saw sexual graffiti at the Burnsville terminal, but at trial, he testified he had not.

20. Although Beach sent a fax to Yellow Chief Executive Officer Bill Zollars in August 1999, neither the cover sheet nor the information faxed mentioned that Beach felt sexually harassed or that Beach was a Yellow employee. The faxed information consisted of a newspaper article.

21. From late 1996 through approximately March 2000, Beach reported graffiti mentioning his name to several other supervisors: Dock Supervisor Grant Mattson, Dock Supervisor Patrick Heslip, Dock Supervisor Brent Jensen, and City Supervisor Dave Momberger. The graffiti consisted of the phrase "Al Beach sucks."

22. When Plaintiff reported the graffiti to Jensen, Jensen removed it. Jensen saw a similar phrase a few months later and removed it. Likewise, Mattson removed the graffiti after Beach's report to him.

23. Momberger once saw the phrase "Al Beach sucks" in a Yellow trailer between 1995 and 2001.

24. On July 15, 1998, Beach took notes regarding a conversation he had with Patrick Haney, a Regional Manager at Yellow, in which Haney asked Beach about "writing on the walls." There was no evidence that the writing was sexual in nature.

25. Yellow employee David A. Jones saw graffiti about Beach in early 1999, but does not know whether Beach saw the graffiti. Such graffiti included "Al Beach sucks," "Give Al Beach a buck, and he'll fuck you in the butt," "Al Beach sucks giant cocks, sign [sic] Al," and "Al Beach sucks giant Teamster cocks, sign [sic] Al, someone with a cock." Jones took pictures of this graffiti in preparation for his own lawsuit against Yellow.[1] Beach did not personally see the latter two phrases, but he later became aware of them.

26. At unspecified times between 1993 and 2001, Yellow employee Thomas Culhane saw graffiti about Beach in Yellow trailers, including "Give Al Beach a buck, and he'll fuck you in the butt" and "Al Beach is a homo."

27. At unspecified times between 1986 and 1999, former Yellow employee Ron Myrick saw graffiti about Beach in trailers and on bathroom

---

[1] A jury verdict in Jones' favor was issued in May 1999.

walls at the Burnsville terminal, including "Al Beach sucks" and "Al Beach sucks cock."

28. At unspecified times between 1989 and December 5, 2000, former Yellow employee David Walsh daily saw graffiti about Beach in bathrooms and trailers at the Burnsville terminal including "Al Beach fucks his mother" and "Al Beach sucks donkey cock." Walsh also saw depictions of Beach performing a sexual act with a donkey.

**Graffiti Targeting Beach and Yellow's Direct Response: March 15, 1999 to March 15, 2000**

29. After Beach's route changed in September 1999, he rarely saw any graffiti in trailers or at the Burnsville terminal.

30. From March 15, 1999 to March 15, 2000, Beach saw only the graffiti "Al Beach sucks" and "Al Beach is gay."

31. In September 1999, Beach saw "Al Beach sucks" and "Al Beach is gay" written inside a Yellow trailer. Beach first testified that he saw "Al Beach is gay" during his case in rebuttal, and he credibly explained that he had forgotten that fact until another trial witness's testimony refreshed his memory. The Court finds Beach credible in part because his deposition testimony, in which he testified that he saw "Al Beach is gay" written inside Yellow trailers after his route change in September 1999, is not inconsistent with his trial testimony.

32. Beach did not report the above graffiti to anyone at Yellow. The graffiti log does not contain a corroborating entry, but McCoy was instructed to log only graffiti written in the terminal, not in the trailers.

33. On March 5, 2000, Beach saw "Al Beach sucks" written in a trailer.

34. The word "sucks" is a popular or slang term indicating dislike for the subject when used in a phrase such as "work sucks." Beach acknowledged that the phrases "life sucks" and "that movie sucked" could mean that the speaker does not like the subject.

35. Beach's lawsuit was served on March 15, 2000.

**Graffiti Targeting Beach and Yellow's Direct Response: March 16, 2000 to October 2001**

36. On March 22, 2000, Yellow Regional Manager Randy Cox noted on an invoice that the graffiti "Al Beach is gay so is sly Willie" was removed from a Yellow trailer. Cox wrote, "When copy of lawsuit was received (3/21) on 3/21 [sic], I located the trlr [sic] and contacted shop to have it removed."

37. On April 3, 2000, Beach saw "eat me" written in dirt on his trailer, but no name was associated with the phrase. On April 4, 2000, Beach saw "kiss my ass" written on his trailer, but no name was associated with the phrase. These phrases are non-sexual in nature, considering their meaning and the context in which they were written.

38. Beach told Cover, who had become the Distribution Center Manager in 1998, about the "eat me" and "kiss my ass" graffiti and named two Yellow employees whom he believed were responsible: Scott Sawyer and John Born. Cover interviewed Sawyer and Born, but they denied writing the graffiti.[2]

39. On April 5, 2000, Cover instructed Rhodus to check Beach's trailers every day for graffiti. Rhodus has checked Beach's trailers since that date and has not found any graffiti about Beach on trailers.

40. On February 12, 2001, Beach saw "suck me" written on plywood in his assigned trailer, but no name was written.

**Findings Spanning from 1995 to 2001**

41. Beach does not know who wrote any of the graffiti appearing from 1995 to present. He does not know what Yellow could have done to prevent the graffiti, and he admitted Yellow did not have enough information to discipline anyone.

42. At various times between 1995 and 2001, Beach has felt demeaned, humiliated, withdrawn, sad, and degraded as a result of the sexual graffiti.

43. Beach never filed or pursued a grievance regarding graffiti even though the Collective Bargaining Agreement provided for such a procedure.

---

[2] To the extent the Court relied on Plaintiff's Exhibit 121, the Court did not consider paragraphs 4 and 5, which the Court determined at trial were unrelated to the issues in this lawsuit.

44. Beach conceded he was never subjected to unwelcome sexual advances, requests for sexual favors, or sexually motivated physical contact at Yellow.

45. Cover never personally investigated or directed anyone else to investigate the source of graffiti about Beach. Cover stated he had no reason to believe Beach was being targeted by graffiti other than the one complaint Beach made to him.

**Yellow's Sexual Harassment Policies and Training**

46. Yellow's current policy on sexual harassment has been in effect since March 5, 1997. The policy warns that sexual harassment includes "[m]aking sexual remarks, innuendos, jokes, or gestures, or showing pictures or objects, which are offensive or degrading" or "[i]nterfering with an employee's work performance or creating an intimidating, hostile, or offensive workplace by unwelcome sexual language or conduct." If an employee believes he has been harassed, the policy informs him to "try, if possible, to tell the offending person that the conduct is offensive and should be stopped immediately." If the conduct is repeated, the employee is instructed to notify either his immediate supervisor, Department Head, Employee Relations or Human Resources Representative, or Fair Employment Manager. Managers and supervisors are directed to report every complaint of sexual harassment to a

representative of Employee Relations or Human Resources or to a Fair Employment Manager.

47. Trautwein acknowledged that Yellow's policy requires managers to report every complaint of harassment to Human Resources. The first time Trautwein reported a sexual harassment complaint to Human Resources was in 2000.

48. Yellow's previous sexual harassment policy in effect from 1993 to 1997 is almost identical to the current policy.

49. The above policies have been posted on bulletin boards in all departments at the Burnsville terminal since at least 1995.

50. On an unknown date in the 1980s, all Yellow managers and supervisors attended training at the Kansas headquarters, which included training on discrimination and harassment.

51. In 1996, all Yellow management and supervisors were trained on Yellow's Equal Employment Opportunity policies, which included training on sexual harassment.

52. In 1997, Yellow showed an Equal Employment Opportunity training video to all managers and supervisors. The video parodied Charles Dickens' "A Christmas Carol."

53. In or around April 1999, Cover contacted a security firm regarding surveillance technology, but determined that implementing such measures was

impractical because the Burnsville terminal is large and there are many trailers, some of which are located offsite for long periods of time. Furthermore, Cover felt placing cameras in the bathrooms would be an invasion of privacy.

54. Yellow gave "informational messages," pertaining in part to sexual harassment, to all employees at the Burnsville terminal for the first time in May 1999. A letter was sent to road drivers who could not attend.

55. In August 1999, Cover contracted with Tim McCoy, Sr. to check the Burnsville terminal twice a day for graffiti. Cover instructed McCoy to keep a log of the graffiti and remove it. If a name is included in the graffiti, McCoy contacts Cover immediately for additional instructions before removing it.

56. Although McCoy has worked at the Burnsville terminal for nineteen years providing maintenance services for the facility, he was not expressly instructed to remove graffiti until August 1999. However, whenever McCoy saw graffiti prior to that time, he removed it and instructed his employees to do the same.

57. On August 10, 1999, Cover posted a notice at the Burnsville terminal which notified employees that making unwelcome sexual comments violated Yellow's sexual harassment policy and federal law. Cover told employees they could face discipline, including discharge, and could be found personally liable for damages.

58. On August 18, 1999, Yellow mailed a letter to its employees at their home addresses. The letter emphasized treating others with respect in the workplace and noted that a lack of respect could signify sexual harassment. In addition, the letter directed managers and employees to report harassment.

59. In September 1999, Yellow conducted "Respect at Yellow" training for managers and supervisors. This information was abridged, reduced to a six-page document entitled "Respect at Yellow," and presented in three short training meetings to non-management employees from November 1999 until March 2000.

60. On March 28, 2000, General Operations Manager Gary Kraus sent an e-mail to Burnsville terminal managers and supervisors reminding them of their responsibility to keep the facility and equipment free of graffiti.

**Beach's Conduct at Yellow**

61. Beach admitted using the words "hell," "shit," "fuck," "ass," "motherfucker," and "cocksucker" at work. Other Yellow employees heard Beach say not only these words, but also "bitch," "cunt," and "dumb, fucking dyke." When Beach used these words, he was not offended by them.

62. Yellow coworker Kenneth Peterson overheard Beach say he wanted "to bend [a female coworker] over a lunch table and fuck her in the ass" and

that another female coworker "must have a cunt that smells like a sewer." Beach also talked to Peterson at work about Beach's own sexual activity.

63. The Court finds Yellow employee Scott Sawyer not credible with respect to his testimony about sexual comments allegedly made to him by Beach.

64. Rhodus informally counseled Beach about his use of profanity on April 24, 2000. Jensen and Kraus have also talked to Beach about his inappropriate language at work.

65. Beach admitted making sexual remarks about people at work, but he never made such remarks directly to the person about whom he spoke, nor did he ever intend to cause offense.

66. Beach acknowledged that some fellow union members at Yellow may have resented him for his purportedly anti-union activities.

**Beach's Counseling and Psychological Condition**

67. When Beach was a child, his father committed suicide, and his mother was diagnosed with acute paranoid schizophrenia and institutionalized. Beach was placed in foster homes throughout his childhood. When Beach was about ten years old, he was placed in a permanent foster home where he was physically and emotionally abused.

68. Beach was treated for depression in 1977 and in the 1980s.

69. Beach and his wife, Jean Beach, began joint marriage counseling sessions in December 1997 and attended sessions approximately twice a month until June 1998. During these sessions, Beach did not mention the graffiti at work to either his psychologist, Jan Schwartz, or to his wife.

70. Beach first told his wife about the graffiti at work in late 1999. He did not tell her previously because he felt embarrassed and humiliated.

71. Beach initiated individual, monthly counseling sessions with Schwartz in September 1999 and told her for the first time about the graffiti.

72. On October 18, 2000, Schwartz concluded that Beach was experiencing symptoms of depression and post traumatic stress syndrome ("PTSS"), although she admitted Beach did not experience the life-threatening situation which is required for a diagnosis of PTSS. Schwartz clarified that in her role as a psychotherapist, she did not focus on the cause of Beach's condition but on achieving progress. However, Schwartz acknowledged that the combination of Beach's work situation, marriage, and childhood all contributed to his current psychological state. Schwartz also conceded that the onset of depression often occurs in adolescence.

73. Since September 1999, Beach has attended sixteen psychotherapy sessions with Schwartz, which equates to no more than one a month. Schwartz estimated that in the future, Beach would require monthly sessions

for the next six months to one year and occasional sessions for the next five years.

74. The Court discounts the testimony of Dr. Joel Peskay, Beach's forensic psychologist, in large part because Dr. Peskay did not know prior to making his diagnosis that Beach had twice been diagnosed with depression before 1995. Dr. Peskay admitted that such diagnoses would affect his present diagnosis of adjustment disorder with depression and anxiety. In addition, Dr. Peskay conceded that he did not independently corroborate Beach's version of events before reaching his psychological assessment on November 30, 2000, which is the standard of practice for forensic examinations. Finally, Dr. Peskay received materials from Yellow's management after he completed his report, which he claimed corroborated Beach's version of events. To the contrary, there is ample evidence that Yellow and Beach do not agree on several important points. The Court does find credible Dr. Peskay's testimony that Beach's situation at work could have exacerbated a previously existing psychological condition.

75. The Court finds credible the testimony of forensic psychiatrist Dr. Michael Farnsworth. Dr. Farnsworth opined that the likelihood of a third episode of depression after two depressive episodes is between eighty and ninety percent. Beach is also predisposed to psychological illness given his family history of mental illness and his diabetic condition. Given Beach's

previous depression, physical health, family history, and marital problems, it is not possible to conclude that Beach's situation at work caused his current depression. As Dr. Farnsworth testified, Beach's activities are inconsistent with a diagnosis of depression. In 1997, Beach began taking flying lessons with the intent of obtaining a pilot's license. In June 1999 and approximately the same time in 2000, Beach went on sailing trips with his wife. The Beaches also planned to take a sailing vacation in the Carribean. Beach considered running for public office. These activities suggest ambition, forward-thinking, motivation, and self-esteem, which are attributes inconsistent with PTSS and depression.

**<u>Beach's Overtime at Yellow</u>**

76. In 1994, Beach worked overtime on seven days that he was not otherwise scheduled to work, not counting the overtime worked because of a strike. In 1995, Beach worked overtime on one day that he was not otherwise scheduled to work and a total of 109 overtime hours. In 1996, Beach worked no extra days and a total of 100 overtime hours. In 1997, Beach worked overtime on four days that he was not otherwise scheduled to work and a total of 160 overtime hours. In 1998, Beach worked no extra days and a total of 72 overtime hours. In 1999, Beach worked no extra days and a total of 130 overtime hours. In 2000, Beach worked no extra days and a total of 218 overtime hours.

## CONCLUSIONS OF LAW

### I. Jurisdiction

This action is brought pursuant to the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.01, subd. 41. This Court has jurisdiction over this matter based on diversity of citizenship under 28 U.S.C. § 1332(a).

### II. Beach's MHRA Claim

To establish same-gender sexual harassment in Minnesota, a plaintiff must establish the statutory elements of sexual harassment. See Cummings v. Koehnen, 568 N.W.2d 418, 421 (Minn. 1997). Sexual harassment is defined in relevant part as

> unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when . . . .
>
> . . . .
>
> (3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive employment . . . environment; and in the case of employment, the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.

Minn. Stat. § 363.01, subd. 41. The plaintiff need not prove that the conduct was "because of sex," meaning that the harassment had a disparate effect on one gender or that the perpetrator was homosexual. See Cummings, 568

N.W.2d at 421-24 (noting the difference between federal law and the MHRA). The Minnesota Supreme Court has declined to follow the federal rule "because the MHRA is not similar to Title VII in its treatment of sexual harassment." Id. at 422 n.5. Thus, a plaintiff suing under the MHRA need only prove the elements of sexual harassment enumerated in section 363.01, subd. 41. See id. at 424.

Section 363.06 of the MHRA provides that a plaintiff may bring a civil action for a violation of sexual harassment in accordance with section 363.14. See Minn. Stat. § 363.06, subd. 1. Section 363.06 also establishes a statute of limitations for such actions; claims brought under the MHRA must be filed within one year of the allegedly harassing act. See id. § 363.06, subd. 3. However, there is an exception to the rule if continuing violations formed a pattern of harassment over a period of time, as long as at least one incident of harassment occurred within the limitations period. See Treanor v. MCI Telecomm. Corp., 200 F.3d 570, 573 (8th Cir. 2000) (citation omitted); Giuliani v. Stuart Corp, 512 N.W.2d 589, 595 (Minn. App. 1994). This exception is known as the continuing violations doctrine. Whether the statute of limitations applies is a threshold issue. See Sigurdson v. Isanti County, 448 N.W.2d 62, 66 (Minn. 1989).

### A. Whether the Continuing Violations Doctrine Is Applicable

Yellow asserts that Beach cannot identify a specific instance of sexual harassment at Yellow during the relevant one-year limitations period, and therefore, his claim is barred. Beach served his lawsuit on March 15, 2000; thus, the relevant one-year period in the present case is from March 15, 1999 to March 15, 2000. During that one-year period, Beach saw the graffiti "Al Beach sucks" and "Al Beach is gay." The Court has found the phrase "Al Beach sucks" non-sexual in nature. Thus, the only possible incident of harassment occurring within the limitations period is when Beach saw the phrase "Al Beach is gay" written inside a Yellow trailer in September 1999.

Yellow does not dispute that this graffiti is sexual in nature and substantively satisfies the single act requirement to invoke the continuing violations doctrine, nor does Yellow argue that the graffiti occurring from 1995 to 1999 is not a pattern of harassment over a period of time.[3] Yellow argues only that Beach's testimony that he saw "Al Beach is gay" in September 1999 (1) is not credible and (2) is improper rebuttal evidence according to Gossett v. Weyerhauser Co., 856 F.2d 1154 (8th Cir. 1988).

---

[3] Nevertheless, the Court concludes that this graffiti is sexual in nature and substantively satisfies the single act requirement. The Court further concludes that this act of graffiti was part of an ongoing pattern of harassment over time.

1. **Credibility**

The Court has found that Beach credibly testified that he saw the graffiti "Al Beach is gay" inside a Yellow trailer in September 1999. Contrary to Yellow's assertion, Beach did testify when and where he saw the graffiti. As to Yellow's argument that Beach's deposition testimony is contradictory and not lucid, Yellow did not introduce the deposition testimony as evidence. Plaintiff's counsel read aloud only one sentence of the deposition during the trial, and it was not inconsistent with Beach's trial testimony. Thus, Yellow has presented no proof in support of its argument. Yellow also contends that the graffiti log shows no record of the graffiti at issue; however, the evidence at trial revealed that the log was not intended to include graffiti written in trailers. Finally, Yellow observes that no trial witness corroborated Beach's assertion, but corroboration is not required to find a witness credible.

2. **Rebuttal Testimony**

Turning to Yellow's argument that Beach's testimony was improper rebuttal evidence, it is true that Beach testified for the first time during his case in rebuttal that he saw the phrase "Al Beach is gay" in September 1999. During Beach's case in chief, he did not explicitly testify that he saw the phrase "Al Beach is gay" between March 15, 1999 and March 15, 2000. Rather, he testified on direct that he saw that phrase several times between 1995 and 2000. When asked on cross-examination if, in 1999, the only phrase he saw

was "Al Beach sucks," Beach replied, "I think so. Yes." Subsequently, during Beach's case in rebuttal, he stated that he saw the phrase "Al Beach is gay" in September 1999 and credibly explained that he had forgotten that fact until another trial witness's testimony refreshed his memory. Beach remembered his deposition, in which he testified that he saw "Al Beach is gay" written inside a Yellow trailer after his route change in September 1999.

"The function of rebuttal is to explain, repel, counteract or disprove evidence of the adverse party." United States v. Luschen, 614 F.2d 1164,1170 (8th Cir. 1980) (citing United States v. Finis P. Ernest, Inc., 509 F.2d 1256, 1263 (7th Cir. 1975)). The trial court has discretion to allow a party to offer additional evidence on rebuttal, depending on the circumstances of the case. See Gossett, 856 F.2d at 1156 (quoting Smith v. Conley, 584 F.2d 844, 846 (8th Cir.1978) (quoting Skogen v. Dow Chem. Co., 375 F.2d 692, 705 (8th Cir.1967))). Three factors to consider when allowing such evidence are surprise to the opposing party, the opposing party's opportunity to challenge the evidence, and detriment to the opposing party caused by the order of the evidence. See United States v. Powers, 572 F.2d 146, 152-53 & n.6 (8th Cir. 1978) (citing United States v. Webb, 533 F.2d 391, 395 (8th Cir. 1976)).

The Court finds that the evidence was properly elicited on rebuttal on two independent grounds. First, Yellow did not object to the testimony at

the time it was offered, but first challenged the evidence during its closing argument.

Second, the circumstances of the case permit the additional evidence. Yellow was not surprised by the evidence, had an opportunity to challenge it, and suffered no detriment other than the proof itself. Beach testified in his case in chief that he saw the phrase "Al Beach is gay" at the Burnsville terminal at various times between 1995 and 2000. On rebuttal, Beach merely clarified the specific date of one of those instances. Furthermore, Beach's rebuttal testimony is not inconsistent with his deposition testimony, of which Yellow was aware, that he saw the phrase "Al Beach is gay" after his route change in September 1999.[4] It is significant that Yellow cross-examined Beach on rebuttal, but did not even mention the new testimony. Thus, Yellow had an opportunity to question the new testimony but opted not to. Finally, while the evidence itself was detrimental to Yellow's defense (which is no basis for relief), Yellow has not shown how else it was disadvantaged. Thus, in the Court's discretion, Beach properly introduced this evidence during rebuttal.

---

[4] In this respect, the present case differs from Gossett, on which Yellow relies, where the rebuttal evidence consisted of the testimony of an expert witness who was not identified to the opposing party prior to trial. See 856 F.2d at 1156. Here, Yellow was aware of Beach's prior deposition testimony and Beach's position throughout the litigation that he saw sexual graffiti written about him at Yellow during the one-year statutory period.

### 3. Conclusion

The continuing violations doctrine is applicable to Beach's MHRA claim. The allegedly harassing graffiti occurred over a period of time, and one incident of harassment occurred within the one-year statutory period. In a sexual harassment claim based on a hostile environment, "it is reasonable to expect that violations are continuing in nature . . . [and] often straddle both sides of an artificial statutory cut-off date." Jenson v. Eveleth Taconite Co., 824 F. Supp. 847, 877 (D. Minn. 1993). Thus, the Court will consider whether the sexual graffiti targeting Beach from 1995 to March 15, 2000 meets the statutory elements of sexual harassment.

## B. Whether Verbal Conduct or Communication of a Sexual Nature Existed

Yellow does not dispute that most of the graffiti introduced as evidence at trial are communications of a sexual nature. In its post-trial memorandum, Yellow argues only that the phrases "Al Beach sucks" and "Kill Al Beach" are non-sexual. The Court agrees with Yellow about these particular phrases. However, Yellow does not even address the other sexual graffiti Beach saw from 1995 to through 1999, which included "Al Beach sucks cock," "Al Beach is gay," "Al Beach fucks his mother in the ass," and "Give Beach a buck and he'll fuck you in the butt." The Court concludes that the above phrases are verbal communications of a sexual nature.

### C. **Whether the Communications Were Unwelcome**

Conduct is unwelcome if the employee "neither solicited it or invited it and regarded it as undesirable or offensive." See Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 966 (8th Cir. 1999) (citations omitted). The determination centers on whether the employee by his own conduct indicated that the conduct was unwelcome. See id. (examining whether an employee engages in conduct similar to that about which he complains).

The Court finds that Beach did not indicate by his own conduct that the sexual graffiti targeting him was welcome. First, although Beach used sexual language at work, he only spoke the words, which by their nature disappear when uttered. This conduct is significantly dissimilar from graffiti inscribed on walls and trailers in the workplace, some of which remained for weeks or months. Second, the context in which Beach used arguably sexual words was often non-sexual, such as calling members of Yellow management "cocksuckers" for not letting employees go home early on Easter Sunday. Third, there was far more sexual graffiti written about Beach than sexual comments made by Beach. Fourth, Beach did not make sexual comments directly to the person who was the subject of those comments. Of the four decidedly sexual comments Beach made mentioning a person by name, none of the people were ever aware of the comments, unlike Beach, who frequently saw graffiti about himself. In conclusion, Beach is unlike the plaintiff in Scusa who

"engaged in the very type of conduct about which she now complains." 181 F.3d at 967.

Furthermore, Beach clearly regarded the graffiti written about him as offensive and undesirable. He credibly testified that the graffiti caused him to feel embarrassed, demeaned, and degraded, and coworkers confirmed that the graffiti was offensive to Beach. Even Cover admitted Beach was upset and insulted by the graffiti. Beach complained to Yellow managers or supervisors on several occasions and expressed his offense.

The Court concludes that the sexual graffiti at Yellow was unwelcome to Beach.

### D. Whether the Communications Substantially Interfered with Beach's Employment or Created an Intimidating, Hostile, or Offensive Employment Environment

The Court finds that the graffiti did not substantially interfere with Beach's employment. Although he felt demeaned and degraded, spent time covering graffiti and reporting to managers, and sought counseling, the interference with his employment was not substantial.

However, the Court concludes that the graffiti created a hostile and offensive employment environment. The environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris v. Forklift Sys., Inc., 510

U.S. 17, 21-22 (1993)); see also Cummings, 568 N.W.2d at 424 (further requiring the conduct to be sufficiently pervasive). The objective requirement ensures that ordinary horseplay or flirtation is not characterized as sexual harassment. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). The conduct must be examined "as a whole in addition to the individual comments or acts." Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999) (observing that the accumulation of offensive conduct shapes the work environment).

Beach has shown that his employment environment at Yellow was offensive and hostile. Sexual graffiti was written about him on bathroom walls, stairwells, forklifts, and numerous trailers. The graffiti suggested that Beach was a homosexual,[5] was a prostitute, and had sexual intercourse with his mother. Beach found this graffiti offensive, and a reasonable man would also consider it offensive. Although other Yellow employees saw the phrases "Al Beach sucks giant cocks," "Al Beach sucks giant Teamster cocks," "Al Beach is a homo," and "Al Beach sucks donkey cock," Beach may not rely on incidents about which he was not aware to prove he was subject to a sexually hostile or offensive work environment. See Johns v. Harborage I, LTD., 585 N.W.2d 853, 861 (Minn. App. 1998) (citation omitted). However, Beach became aware of

[5] The Court is not suggesting that homosexuality is inherently offensive.

some of these sexual phrases and other sexual graffiti when co-workers and customers mentioned it to him.

The sexual graffiti made Beach feel humiliated, upset, sad, and demeaned. The Court has already found that the objectionable behavior was unwelcome, and whether conduct "is unwelcomed is to be determined by weighing whether the conduct was uninvited and offensive." See Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 962 (8th Cir. 1993). The Court concludes that the sexual graffiti of which Beach was aware from 1995 through 1999 was objectively and subjectively offensive.

The graffiti was also severe and pervasive. Beach's case differs from Klink v. Ramsey County, 397 N.W.2d 894 (Minn. App. 1986), upon which Yellow relies. In Klink, the conduct was found not to be severe or pervasive because the objectionable language was used in private offices and was not directed at the plaintiff, and the plaintiff was "not invited" to view offensive material. See id. at 902, abrogated on other grounds by Cummings, 568 N.W.2d at 420 n.2. On the other hand, sexual language at Yellow was directed at Beach and located in numerous public places and trailers to which he was assigned so that he could not avoid seeing the graffiti. Beach saw this sexual graffiti from 1995 through 1999. Although Beach removed some of the graffiti himself and some managers removed graffiti when they saw it, much of the graffiti remained for long periods of time.

The Court concludes that the sexual graffiti at Yellow created an intimidating and hostile work environment for Beach.

### E. Whether Yellow Knew or Should Have Known of the Harassment

Yellow acknowledges that its managers were informed of graffiti on a "few occasions," but challenges Beach's assertion that he repeatedly reported it. Yellow does not otherwise dispute that it knew or should have known about the sexual graffiti.

Yellow's argument based on Beach's non-reporting is specious. The law does not require the employee to report objectionable conduct; the law requires only that the plaintiff show that his employer knew or should have known of the harassment. An employee may prove knowledge by showing he reported the harassment to management, or by showing the harassment was pervasive, which permits an inference of knowledge. See Henson v. City of Dundee, 682 F.2d 897, 905 (8th Cir. 1982) (citations omitted). Thus, reporting the conduct to management is but one means of satisfying the knowledge requirement.

The Court finds that Yellow knew about the sexual graffiti written about Beach. In 1995 and 1996, Beach reported sexual graffiti twice to Cover and once to Trautwein. Although Beach complained of graffiti to other mangers as well, there was no evidence that the graffiti was sexual in nature.

The Court also finds that even if Yellow did not know about the sexual graffiti, the graffiti was so pervasive that it should have known. In this context, "pervasive" means that "'the harassing behavior happens frequently enough that the employer can take steps to prevent it.'" Jenson, 824 F. Supp. at 887 (quoting Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1531 (M.D. Fla. 1991)) (further finding that "common and continuous" acts of harassment could not have escaped management's attention). After Jones' trial in May 1999, Yellow took several steps to prevent graffiti, and as all witnesses acknowledged, there have been very few incidents of sexual graffiti about Beach thereafter. Thus, the graffiti clearly happened frequently enough for Yellow to have been able to prevent it. Moreover, the Court has found that sexual graffiti about Beach was pervasive throughout the workplace and continued from 1995 through 1999. The graffiti could not have escaped management's attention.

### F. Whether Yellow Failed to Take Timely and Appropriate Action

Timely and appropriate action under the MHRA includes measures such as disseminating an anti-harassment policy or threatening disciplinary action against offending employees. See McNabb v. Cub Foods, 352 N.W.2d 378, 384 (Minn. 1984). An employer must prevent and remedy sexual harassment when it learns of the conduct. Id.

Beach reported sexual graffiti to management at least four times: once to Cover in September 1995, once to Cover after September 1995, once to Trautwein in 1996, and once to Harvey on an unspecified date. Not once did Yellow take timely and appropriate action such as disseminating an anti-harassment policy or threatening disciplinary action against offending employees. Yellow contends that its managers did not know who was responsible for the graffiti. However, an employer is not free to ignore harassment merely because it does not know the offending employee's identity. See Continental Can Co. v. Minnesota, 297 N.W.2d 241, 250 (Minn. 1980); see also Jenson, 824 F. Supp. at 887 (finding employer's response inadequate when it made little attempt to identify or discipline the harassing employees). There is scant evidence that Yellow attempted to learn the identities of the culprits. For example, when Beach told Trautwein the name of an employee he suspected, Trautwein did not give the information to Harvey.

Yellow's response consisted of removing the graffiti and perhaps reporting the complaint to yet another supervisor. No manager or supervisor ever reported Beach's complaints to a representative of Employee Relations or Human Resources or to the Fair Employment Manager as required by Yellow's sexual harassment policy. Yellow attempts to excuse its deficient response by accusing Beach of failing to use the magic words "sexual harassment" in his reports, but this argument only accentuates Yellow's misconception of what is

required to formulate a timely and appropriate response to sexual harassment in the workplace. Yellow's sexual harassment policy defines such harassment as "sexual remarks, innuendos, jokes, or gestures, or showing pictures or objects, which are offensive or degrading." For Yellow management not to recognize sexual harassment when it is described in the very words defining it is inexcusable.

Although Yellow posted its sexual harassment policy in the workplace it did not reiterate the policy to its employees until May 1999, well after Beach's complaints. In addition, Yellow did not threaten disciplinary action against employees who wrote sexually harassing graffiti until August 10, 1999, when Cover issued a notice to Yellow employees. Given that Yellow first learned of sexual graffiti targeting Beach in 1995, Yellow did not take timely and appropriate action to either correct or prevent the harassment.

When an employer learns of harassment, it must take "prompt remedial action reasonably calculated to end the harassment." Davis v. Tri-State Mack Distrib., Inc., 981 F.2d 340, 343 (8th Cir. 1992). When Beach told Yellow of the sexual graffiti targeting him, Yellow failed to take prompt remedial action.

Yellow's duty to take prompt remedial action was triggered not only when Beach reported the graffiti, but also at other times when the graffiti was so common and pervasive that Yellow could be charged with knowledge of it.

Like the employer in Jenson, Yellow at most responded only to specific complaints about graffiti before May 1999. See 824 F. Supp. at 887. However, Yellow had a duty to take action from September 1995 and thereafter.

Yellow did begin to take timely and appropriate action after the Jones verdict in May 1999. However, these steps emphasize the inadequacy of its response during the time when Beach was experiencing the greatest harassment. Factors in assessing the appropriateness of an employer's response include the length of time between the report and the remedial action, the employer's options, and whether the employer's actions ended the harassment. See Carter, 173 F.3d at 702 (citations omitted). Not until after Jones' trial did Yellow implement remedial measures such as holding meetings with employees, posting additional notices at the Burnsville terminal, sending letters to employee's houses, threatening discipline, conducting training with employees, contracting with McCoy to check the terminal for graffiti every day, and instructing Rhodus to check Beach's trailer every day. There is no reason why Yellow did not begin to implement these measures in 1995 when Beach first complained to Cover about sexual graffiti. All of the trial witnesses agreed that the graffiti is practically nonexistent since Yellow implemented these measures. On the other hand, Yellow's actions in response to Beach's reports did not end the harassment, but the graffiti actually increased.

Although Yellow began to take timely and appropriate action in May 1999, its actions before that date were not.

**G. Causation**

Yellow contends that Beach has not shown that his injuries were a direct result of the sexual harassment, relying on medical evidence establishing that Beach was predisposed to depression. The Court agrees that Beach's current diagnosis of depression did not entirely result from the harassment at Yellow. However, the sexual harassment at Yellow did cause Beach to feel demeaned, degraded, humiliated, sad unmotivated, upset, and insulted.

**H. Conclusion**

Beach has proven his claim of same-gender sexual harassment under the MHRA. He was subjected to verbal conduct or communication of a sexual nature which created a hostile and offensive employment environment. Yellow both knew and should have known of the harassment, but failed to take timely and appropriate action.

**III. Yellow's Affirmative Defenses**

Yellow asserts the affirmative defenses of laches and unclean hands. The Court finds these defenses unavailing.

**IV. Damages**

The MHRA instructs that if an employer is found to have engaged in an unfair discriminatory practice, such as sexual harassment, a court shall

order relief as provided by section 363.071, subd. 2. See Minn. Stat. § 363.14, subd. 2.

Based on the foregoing findings of fact and conclusions of law, Beach is entitled to damages in the amount of $36,920.00. Beach is awarded compensatory damages for past mental anguish and suffering, which occurred as a result of the sexual harassment, in the amount of $25,000.00. Beach is awarded compensatory damages for future mental anguish and suffering, which will occur as a result of the sexual harassment, in the amount of $10,000.00. Beach is also awarded $960.00 for individual counseling expenses he has incurred to date, and $960.00 for future individual counseling expenses. Beach is not entitled to damages for lost earnings or economic loss because he did not establish that the harassment at Yellow caused him lost overtime or earnings. In the Court's discretion, the Court declines to award Beach treble compensatory damages. See Minn. Stat. § 363.071, subd. 2 (permitting a court to award "compensatory damages in an amount up to three times the actual damages sustained") (emphasis added).

The Court also declines to award punitive damages in this case. While Beach established his case by a preponderance of the evidence, he has not shown by clear and convincing evidence that Yellow deliberately disregarded the rights or safety of others. See Minn. Stat. § 549.20.

Beach asks the Court to impose a civil penalty payable to the state of Minnesota, in accordance with section 363.071 of the MHRA, which mandates the imposition of the penalty when an employer is found to have violated Minn. Stat. § 363.03. See Minn. Stat. § 363.071, subd. 2. The Court must consider "the seriousness and extent of the violation, the public harm occasioned by the violation, whether the violation was intentional, and the financial resources of the [employer]." Id. Taking into account these considerations, the Court orders Yellow to pay a civil penalty in the amount of $5000.00.

Finally, the MHRA gives the Court discretion to award reasonable attorney's fees and costs to a prevailing party. See Minn. Stat. § 363.14, subd. 3. Beach's counsel is ordered to provide the Court with a fee petition within ten days of the date of this Order. Yellow may submit a response to the petition within ten days of being served with it.

## ADDITIONAL ISSUE

### Yellow's Motion for Judgment as a Matter of Law

Yellow orally made a motion for judgment as a matter of law at the close of Plaintiff's case-in-chief and renewed it after the close of evidence. The Court denied the motion both times. Federal Rule of Civil Procedure 52(c) provides for judgment on partial findings and permits a court to enter

judgment as a matter of law against a party on a claim or defense or to "decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule." Fed. R. Civ. P. 52(c). In the present case, the Court declined to orally render judgment and decided to render judgment at the close of all the evidence in the form of findings of fact and conclusions of law. As the advisory committee's note indicates, Rule 52(c) "authorizes," but does not require, "the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence." Fed. R. Civ. P. 52 advisory committee's note (1991) (also stating that "the court retains discretion to enter no judgment prior to the close of the evidence.")

Based on the Court's findings of fact and conclusions of law, it is hereby **ORDERED** that:

(1) Judgment be entered against Defendant Yellow Freight System, Inc., and for Plaintiff Allen Beach in the amount of $36,920.00;

(2) Defendant is ordered to pay a civil penalty to the State of Minnesota in the amount of $5000.00; and

(3) The Court reserves ruling on Plaintiff's request for an award of attorney's fees so that Plaintiff's counsel may provide the Court with a fee

petition. The petition must be filed and served within ten days of the date of this Order. Defendant is permitted to file a response to the petition within ten days of being served with it.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 31, 2001

JONATHAN LEBEDOFF
United States Magistrate Judge

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.